UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREW VAIL,

                       Plaintiff,

    -v-

THE CITY OF NEW YORK, R.N. OTILLA
PHILLIPS-DRAKE, and M.D. SEIN THAN,

                 Defendants.

Case No. 12-CV-6125 (KMK)

OPINION AND ORDER

<u>Appearances:</u>

Andrew Vail
New York, NY
*Pro se Plaintiff*

Austa Starr Devlin, Esq.
Gillian C. Thomas, Esq.
Heidell, Pittoni, Murphy & Bach, LLP
Stamford, CT
*Counsel for Defendants City of New York, R.N. Phillips-Drake, and M.D. Sein Than*

Brendan James Alt, Esq.
Heidell, Pittoni, Murphy & Bach, LLP
White Plains, NY
*Counsel for Defendants City of New York, R.N. Phillips-Drake, and M.D. Sein Than*

James William Magee, Esq.
Heidell, Pittoni, Murphy & Bach, LLP
New York, NY
*Counsel for Defendant City of New York*

Laura Anne Delvecchio, Esq.
Heidell, Pittoni, Murphy & Bach, LLP
New York, NY
*Counsel for Defendants City of New York, R.N. Phillips-Drake, and M.D. Sein Than*

Michael Finkelstein, Esq.
New York City Law Department, Corporation Counsel
New York, NY
*Counsel for Defendants City of New York, R.N. Phillips-Drake, and M.D. Sein Than*

KENNETH M. KARAS, District Judge:

Plaintiff Andrew Vail, pro se, brought the instant Action in August 2012, and currently alleges three causes of action related to medical treatment he received while incarcerated under the care of the New York City Department of Corrections.  Before the Court is Defendants' Motion for Judgment on the Pleadings.  For the following reasons, the Court grants Defendants' Motion.

## I.  BACKGROUND

### A.  Factual Background

The events giving rise to this action occurred on September 2, 2010, while Plaintiff was incarcerated at the Anna M. Kross Center ("AMKC") at Rikers Island Prison Facility.  (*See* Second Am. Compl. (July 19, 2013) ("SAC") ¶¶ 3, 12–16 (Dkt. No. 45).)  Defendants R.N. Otilia Phillips-Drakes ("Phillips-Drakes") and M.D. Sein Than ("Dr. Than") (collectively, the "Rikers Defendants") were, respectively, a "registered nurse" and a "medical doctor," each of whom was "employed by Corizon and contracted by [Defendant City of New York] to provide medical services at the Rikers Island Prison Facility."  (*Id.* ¶¶ 6–7.)[1]  Plaintiff alleges in his Second Amended Complaint that, "on September 2, 2010[,] at approximately 6:00 P.M.,

_____

[1] The Second Amended Complaint's reference to "Corizon" appears to refer to Corizon Health, Inc., a third-party provider of prison health services.  *See* Corizon, http://www.corizonhealth.com (last visited Aug. 18, 2014).  Corizon is not a defendant in this case, and the Complaint does not otherwise discuss Corizon.

Moreover, the case caption lists Defendant Otilia Phillips-Drakes as "Otilla Phillips-Drake."  (*See* Dkt.)  For the sake of clarity, the Court notes that all references to "Otilia Phillips-Drakes" in this Opinion refer to the individual listed in the caption as "Otilla Phillips-Drake."

[Plaintiff] was summoned to the Harts[] Island Clinic located within the [AMKC] to receive his medication, Tylenol No. 3 [with] codeine, which [had been] prescribed to him by Dr. Theodora Key-Njemanze, D.O. on August 25, 2010." (*Id.* ¶ 15.)[2]  Plaintiff "was under the professional care of [D]efendants Phillips-Drakes and [Dr.] Than" that evening, the former of whom was responsible for dispensing Plaintiff's medication.  (*Id.* ¶¶ 14, 16.)  Plaintiff alleges that, before administering medication to Plaintiff, Phillips-Drakes "failed to verify [Plaintiff's] identification."  (*Id.* ¶ 16.)  Thus, instead of administering prescription Tylenol, Phillips-Drakes administered "Librium, a powerful[,] fast-acting benzodiazepine," even though Plaintiff did not have a prescription for that medication.  (*Id.*)  In response, Plaintiff "protested that the [administered] medication . . . was inconsistent in size, shape and color to [his] regularly prescribed medication."  (*Id.*)  Nevertheless, he took the medication.  (*Id.*)

Shortly thereafter, Plaintiff "began to feel ill," prompting him to "complain[] to correctional staff."  (*Id.* ¶ 17.)  Plaintiff alleges that he was "immediately seen by [D]efendant [Phillips-]Drakes, who, after taking [Plaintiff's] vital signs, discovered [that he] was suffering severe acute tachycardia and hypertension, as well as an abnormal E.K.G."  (*Id.*)  "[Phillips-Drakes] then immediately notified . . . [Dr.] Than," who subsequently "examined [Plaintiff]." (*Id.* ¶¶ 17–18.)  Dr. Than then "consulted" another doctor, and "it was determined [that Plaintiff] was suffering acute cardiac abnormalities, and needed to be immediately rushed via emergency medical services to [a hospital] for emergency treatment and intervention."  (*Id.* ¶ 18.)  An ambulance arrived less than an hour later and transported Plaintiff to the hospital.  (*See id.* ¶ 19; *see also* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Opp'n") (June 29, 2014) 1

---

[2] Dr. Kay-Njemanze is not a defendant in this case, and the Second Amended Complaint does not contain any other allegations regarding this individual.

(Dkt. No. 96) (noting Plaintiff was "immediately rushed via ambulance to [the hospital] for emergency treatment and care).)  Plaintiff alleges that one of the emergency medical technicians ("EMTs"), EMT Rosado, "notice[d] that . . . [Phillips-]Drakes and [Dr.] Than [had] erroneously medicate[d], treat[ed,] and advise[d] Plaintiff . . . , as they believed him to be another patient, Luis Vega," and notified them of their error.  (*Id.* ¶¶ 20–21.)  Plaintiff also alleges that he "was escorted by two . . . correctional officers . . . who told [him] not to tell anybody about the incident," (*id.* ¶ 20), and that the Rikers Defendants thereafter "participate[d] in a cover-up in order to protect themselves from possible legal, professional, and/or other ramifications," (*id.* ¶ 21).  Plaintiff does not allege what happened at the hospital that night, but he does allege that the Rikers Defendants' mistake caused Plaintiff to "suffer[] and continue[] to suffer from extreme physical pain and mental anguish, including but not limited to hypertension, current and ongoing palpitations, tachycardia, left ventricular hypertrophy, heightened anxiety, depression[,] and insomnia among other ailments and conditions, some of which are persistent and may be deemed permanent."  (*Id.* ¶ 31.)

     B.  <u>Procedural History</u>

     Before he filed the instant Action, Plaintiff filed a similar lawsuit in New York Supreme Court against Defendant City of New York on December 7, 2011, alleging a medical-malpractice claim based on essentially the same facts.  (*Id*. ¶ 8–9; *see also id.* Ex. A (state court opinion).)  On November 20, 2012, the Supreme Court dismissed Plaintiff's lawsuit on the grounds that Plaintiff failed to file a timely notice of claim, which is a "condition precedent" to the commencement of an action against a municipality such as the City of New York.  N.Y. Gen. Mun. Law § 50-e(1)(a).  (*See also* SAC Ex. A (state court opinion) at 2, 6.)

Plaintiff then filed the instant Action on August 6, 2012, alleging two causes of action—one apparently under 42 U.S.C. § 1983, claiming that the Rikers Defendants acted with deliberate indifference towards Plaintiff's health, and the other under state law, alleging that Defendant City of New York breached a "duty to protect" Plaintiff by failing to supervise and/or screen the Rikers Defendants and by failing to resolve and/or investigate the incident.  (*See* Compl. (Dkt. No. 2).)  Then, in a letter dated April 18, 2013, sent after he had served all three Defendants, Plaintiff requested leave to file an amended complaint on the grounds that he had "come across material and facts which would significantly clarify the original complaint." (Letter from Pl. to Court (April 24, 2013) (Dkt. No. 25).)  The Court granted that request on April 23, 2013.  (*See id.*)  Plaintiff filed his Amended Complaint on May 22, 2013, alleging essentially the same two claims against the same three Defendants.  (*See* First Am. Verified Compl. (Dkt. No. 27).)

On July 3, 2013, less than two months later, and after Defendants had filed Answers to the Amended Complaint, Plaintiff sought leave to file a second amended complaint, averring that he had "failed to state supplemental jurisdiction over [his] state law tort claims" and that he "wishe[d] to clarify [a paragraph] of his Amended Complaint to strike the inadvertent deliberate indifference wording in his medical malpractice cause of action."  (*See* Mot. for Leave To File a Second Am. Compl. (July 24, 2013) ¶¶ 1–2 (Dkt. No. 46).)  Plaintiff also wished to add a supplemental state claim.  (*See* Aff. in Supp. of Mot. for Leave To File a Second Am. Compl. ¶ 2 (July 24, 2013) (Dkt. No. 46).)  On July 23, 2013, the Court granted Plaintiff's request, and it accepted for filing the proposed Second Amended Complaint that Plaintiff had attached to his Motion for Leave To Amend.  (*See* Dkt. No. 46 (granting Plaintiff's Motion); SAC.)  That Complaint, which is the operative Complaint for the purposes of Defendants' Motion, includes

three causes of action—one under § 1983, alleging that the Rikers Defendants acted with deliberate indifference to Plaintiff's serious medical need, and two under state law, alleging that the Rikers Defendants committed medical malpractice when they treated Plaintiff on September 2, 2010, and that Defendant City of New York is liable for those Defendants' actions under a theory of *respondeat superior* liability.  (*See* SAC ¶¶ 22–33.)

Prior to granting Plaintiff leave to file his Second Amended Complaint, on July 9, 2013, the Court held a conference at which the Court adopted a discovery schedule and entered an order referring the case to Magistrate Judge Paul E. Davison for general pretrial purposes.  (*See* Dkt. No. 42 (Order of Reference); Dkt. No. 55 (Case Management & Scheduling Order); Dkt. (minute entry for July 9, 2013).)  After a conference held on August 8, 2013, Magistrate Judge Davison issued two orders authorizing the release of certain medical records to Plaintiff.  (*See* Dkt. Nos. 57, 59.)  He also issued an order denying Plaintiff's July 29, 2013 request for the appointment of pro bono counsel, finding that he "[could not] presently ascertain whether or not [P]laintiff's claims [met] the threshold merit requirement," and that, to date, Plaintiff had "shown an ability to effectively prosecute his case."  (*See* Dkt. No. 58, at 2; *see also* Mot. for Appointment of Counsel (Dkt. No. 48).)[3]  Subsequently, Magistrate Judge Davison held another conference on September 23, 2013, at which he denied as premature Plaintiff's September 3, 2013 Motion for an order compelling discovery.  (*See* Dkt. (minute entry for Sept. 23, 2013); Mot. for an Order Compelling Disc. (Dkt. No. 60).)  At that conference, Magistrate Judge Davison also scheduled a settlement conference for October 17, 2013.  (*See* Dkt. (minute entry

---

[3] Plaintiff made another request for appointment of counsel in a letter dated October 16, 2013, but Magistrate Judge Davison denied it "[f]or the same reasons stated in [his] [August 8, 2013] decision denying appointment of counsel."  (*See* Dkt. No. 66 (Appl. for the Court to Req. Pro Bono Counsel); Dkt. No. 69 (Order denying request).)

for Sept. 23, 2013).)  However, approximately one week before the conference, Defendants'

counsel informed Magistrate Judge Davison that Defendants "[were] no longer interested in

participating in a settlement conference at [that] time," but instead wished to request a pre-

motion conference from this Court.  (*See* Dkt. No. 64 (Letter from Laura A. Del Vecchio, Esq.,

to Magistrate Judge Davison (Oct. 10, 2013)).)  Magistrate Judge Davison granted that request

and stayed discovery pending the outcome of Defendants' request.  (*See* Dkt. No. 64

(memorandum from Magistrate Judge Davison, dated Oct. 15, 2013).)[4]

      Defendants thereafter submitted a request for a pre-motion conference in a letter dated

October 18, 2013, and the Court granted that request three days later.  (*See* Letter from Laura A.

Del Vecchio, Esq., to Court (Oct. 18, 2013) (Dkt. No. 67).)  At the conference, held on

December 18, 2013, and attended by Plaintiff via telephone, the Court adopted a scheduling

order whereby Defendants would file their motion no later than February 15, 2014; Plaintiff

would file his response no later than March 15, 2014; and Defendants would file their reply no

later than March 29, 2014.  (*See* Dkt. No. 71 (Scheduling Order); Dkt. (minute entry for Dec. 18,

2013).)  Defendants ultimately filed their Motion and accompanying Memorandum of Law on

February 21, 2014.[5]  (*See* Notice of Mot. ("Mot.") (Dkt. No. 83); Decl. in Supp. of Defs.' Mot.

---

[4] In light of this order staying discovery, Magistrate Judge Davison later denied
Plaintiff's January 14, 2014 request for appointment of expert witnesses without prejudice.  (*See*
Dkt. No. 73 (Notice of Motion for appointment of experts); Dkt. No. 75 (Order denying motion
without prejudice, noting that "Plaintiff may renew [his] request if Defendants['] motion is not
granted").)

[5] The Court granted Defendants a three-day extension to February 18, 2014, and the
docket reflects that Defendants unsuccessfully attempted to file their Motion on that day.  (*See*
Dkt. No. 74 (granting three-day-extension request); Dkt. Nos. 77–78 (incorrectly filed Motion
and Memorandum).)  Defendants apparently were unable to correct the filing error until February
21, 2014.

To Dismiss ("Decl.") (Dkt. No. 84); Mem. of Law in Supp. of Defs.' Mot. To Dismiss the

Compl. Pursuant to F.R.C.P. Rule 12(c) ("Defs.' Mem.") (Dkt. No. 85).)

Before Defendants filed their Motion, in a letter dated February 7, 2014, Plaintiff made

the first of many requests for an extension of his time to respond to the Motion.  (*See* Letter from

Pl. to Court (Feb. 18, 2014) (Dkt. No. 76).)  In that request, Plaintiff informed the Court that he

was imminently "being transferred to another correctional facility"; the Court granted his request

and extended his time to respond by 10 days (i.e., until March 25).  (*See id.*)  Plaintiff submitted

another request, dated February 14, 2014, apparently based on the same underlying

circumstances, wherein he specifically requested a two-week extension; the Court granted that

request as well, adjusting the entire briefing schedule by two weeks.  (*See* Letter from Pl. to

Court (Feb. 24, 2014) (Dkt. No. 86).)  Then, in a letter dated May 6, 2014, Plaintiff informed the

Court that he would be "undergoing . . . surgery in the very near future," and he asked the Court

to suspend the case "until [his] medical issues are taken care of."  (Letter from Pl. to Court (May

13, 2014) (Dkt. No. 88) (internal quotation marks omitted).)[6]  On May 13, the Court granted

Plaintiff's request and stayed the case for 60 days, but it directed Plaintiff to provide a status

update by July 15, 2014.  (*Id.*)  In a letter dated June 21, 2014, Plaintiff informed the Court that

he underwent surgery on June 19, 2014, and that he was "scheduled to follow-up within [two-to-

three] weeks," but that he was at that time "unaware [whether he would] need another surgery."

(Letter from Pl. to Court 1 (June 26, 2014) (Dkt. No. 92).)  He also noted that he had been placed

into protective custody on June 9, 2014, which "preclude[d] the possibility of [him] being able to

physically attend the law library," and that a prison official had denied his request for

---

[6] Plaintiff noted that, "because of security concerns," he was "not entitled to [know] the
exact date" of the surgery.  (Dkt. No. 88.)

photocopies of documents related to his case.  (*Id.* at 2.)  He also specifically requested a further

extension of his time to respond until September 12, 2014, but the Court denied this request on

June 25, 2014.  (*Id.* at 3.)  In a letter dated July 26, 2014, Plaintiff informed the Court that he was

scheduled to be released from custody on July 31, 2014, and he requested that the Court grant an

extension of his time to respond until September 2, 2014.  (*See* Letter from Pl. to Court (July 31,

2014) (Dkt. No. 93).)  The Court granted that request on July 30, 2014.  (*See id.*)  Finally, in a

letter dated August 20, 2014, Plaintiff informed the court that difficulty locating a halfway house

had delayed his release from custody, and he requested a further extension of time.  (*See* Letter

from Pl. to Court (Aug. 20, 2014) (Dkt. No. 94).)  The Court granted Plaintiff two additional

weeks to respond to Defendants' Motion.  (*See id.*)  Plaintiff filed his Opposition to Defendants'

Motion under seal on September 17, 2014.  (*See* Opp'n.)[7]  Defendants filed their Reply on

September 26, 2014.  (*See* Reply Aff. ("Reply") (Sept. 26, 2014) (Dkt. No. 97).)

## II.  DISCUSSION

### A.  Conversion

As exhibits to his Opposition, Plaintiff attached documentary evidence that he did not

include with his Second Amended Complaint.  (*See* Opp'n Exs. A–N.)  These exhibits include an

explanation of the patient identification verification procedure in place at Rikers Island Prison

Facility (*see* Opp'n Ex. A), responses to Plaintiff's interrogatory questions (*see id.* Exs. B and

C), Plaintiff's EKG results (*see id.* Ex. D), a handwriting sample for Phillips-Drakes (*see id.* Ex.

E), copies of Plaintiff's identification card and Luis Vega's admission card (*see id.* Exs. F and

G), images of Acaetaminophen and Codeine Phosphate (Tylenol with Codeine) and

---

[7] On December 1, 2014, the Court issued an Order To Show Cause ordering Plaintiff to
explain why his Opposition, and the exhibits attached thereto, should remain under seal.  (*See*
Dkt. No. 102.)

Chlordiazepoxide Hydrochloride (Librium) (*see id.* Exs. H and J), Plaintiff's medication

administration records (*see id.* Exs. I and K), Plaintiff's inmate history log (*see id.* Ex. L), and

portions of Plaintiff's electronic health records (*see id.* Exs. M and N).  Defendants argue that the

Court should "exclude the additional material and not look beyond the four corners of the

Second Amended Verified Complaint," or, if the Court considers the new evidence, that it should

"convert the [M]otion to one for [s]ummary [j]udgment."  (*See* Reply ¶¶ 4–5.)

   "When matters outside the pleadings are presented in support of, or in opposition to[,] a

[Rule 12(c)] motion, a district court must either exclude the additional material and decide the

motion on the [pleadings] alone[,] or convert the motion to one for summary judgment under

[Rule 56] and afford all parties the opportunity to present supporting material." *Kouakou v.*

*Fideliscare N.Y.*, 920 F. Supp. 2d 391, 396 (S.D.N.Y. 2012) (second and fifth alterations in

original) (internal quotation marks omitted); *see also Friedl v. City of New York*, 210 F.3d 79, 83

(2d Cir. 2000) (discussing same standard in the context of a 12(b)(6) motion).  "Federal courts

have complete discretion" in determining whether to exclude material beyond the pleadings or to

convert a motion to dismiss into a motion for summary judgment.  *Kouakou*, 920 F. Supp. 2d at

396 (internal quotation marks omitted).  The exercise of such discretion "will turn on whether or

not the proffered material, and the resulting conversion . . . , is likely to facilitate the disposition

of the action." *Feder v. Sposato*, No. 11-CV-193, 2014 WL 1801137, at *4 (E.D.N.Y. May 7,

2014) (internal quotation marks omitted).  With this concern in mind, courts in the Second

Circuit have been hesitant to convert a motion to dismiss into a motion for summary judgment

before discovery is complete because "[t]here would be little point in considering a summary

judgment motion when significant relevant facts may yet to be discovered." *Wajilam Exports*

*(Singapore) Pte. Ltd. v. ATL Shipping Ltd.,* 475 F. Supp. 2d 275, 278 (S.D.N.Y.2006); *see also*

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."); *McIntyre v. Longwood Cent. Sch. Dist.*, No. 07-CV-1337, 2008 WL 850263, at *6 (E.D.N.Y. Mar. 27, 2008) (noting that the "plaintiff is entitled to discovery . . . before requiring him to oppose a summary judgment motion"); *Oseni v. Tristar Patrol Servs.*, No. 05-CV-2875, 2006 WL 2972608, at *6 (E.D.N.Y. Oct. 18, 2006) (noting that "[s]ummary judgment is rarely appropriate in cases where the plaintiff has not had the opportunity to conduct discovery"); *cf. Graham v. City of New York*, 869 F. Supp. 2d 337, 346 (E.D.N.Y. 2012) (declining to convert the defendants' motion to dismiss into a motion for summary judgment where the plaintiff "supplied additional documents in further opposition to defendants' motion . . . . [b]ecause the case [could] be decided based on the pleadings").

In this case, Magistrate Judge Davison stayed discovery pending the outcome of Defendants' Motion.  (*See* Dkt. No. 64.)  Therefore, because discovery is far from complete, the Court declines to convert Defendants' Motion into a motion for summary judgment.  *See Dowdy v. Hercules,* No. 07-CV-2488, 2010 WL 169624, at *4 (E.D.N.Y. Jan. 15, 2010) ("[I]n light of [the] plaintiff's incarceration, his pro se status, and the lack of any discovery, the [c]ourt declines to convert [the] defendants' motion." (italics omitted)); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 398–99 (S.D.N.Y 2007) (declining to convert the defendant's motion to dismiss into a motion for summary judgment, and declining to consider new exhibits and factual evidence attached to the plaintiff's opposition because, inter alia, "discovery was specifically stayed pending the motion to dismiss, and [the d]efendant . . . raised an issue—sufficiency of the pleadings—that does not require discovery").

Even when adjudicating a motion to dismiss, however, there are certain categories of documents that the Court may take into account.  The Court "may consider . . . any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies," *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (internal quotation marks omitted), in other words, any document that is "integral to the complaint," *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). The Court declines to consider the documents Plaintiff attached to his Opposition here, however, because Plaintiff does not reference them, explicitly or implicitly, in his Second Amended Complaint, nor does he heavily rely on the documents.  Even if Plaintiff relied on the documents when writing his Second Amended Complaint—which no evidence in the record suggests— merely alleging facts supported by the content of the documents does not render them "integral" to the Complaint.  *See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123–24 (S.D.N.Y. 2010) (noting that merely possessing documents, or alleging facts only present in those documents, is not sufficient for them to be considered "integral" to a complaint). Indeed, Plaintiff witnessed much of the conduct he alleged in the Complaint first-hand, so it is unlikely that he based his allegations in any large part on the documents.  The Court, therefore, will exclude the exhibits to Plaintiff's Opposition when deciding Defendants' Motion To Dismiss.

B.  <u>Standard of Review</u>

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings."  *Sellers v. M.C. Floor Crafters, Inc.,* 842

F.2d 639, 642 (2d Cir.1988). "[T]he standards for dismissal pursuant to Rule 12(c) are the same as for a dismissal pursuant to Rule 12(b)(6)." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011). To survive a motion to dismiss under Rule 12(c), therefore, "a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014). In reviewing a complaint, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted). Moreover, as discussed above, along with the Complaint itself, the Court "may consider . . . any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO*, 756 F.3d at 198 (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss," and by extension a Rule 12(c) motion to dismiss, "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining

13

whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).  Where, as here, the complaint was filed pro se, it must be construed liberally with "special solicitude" and interpreted to raise the strongest claims that it suggests.  *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted).

    C.  Analysis

Defendants move to dismiss the Second Amended Complaint for three reasons.  First, they argue that Plaintiff's § 1983 claim against the Rikers Defendants should be dismissed for failure to state a claim that those Defendants were deliberately indifferent to Plaintiff's health, and thereby violated his constitutional rights.  (*See* Defs.' Mem. ¶ 17.)  Second, they argue that Plaintiff's § 1983 "respondent superior" claim against Defendant City of New York should be dismissed for failure "to allege a policy, practice or custom that led to a violation of [Plaintiff's] civil rights." (*Id.* ¶ 28.)  Third, they argue that Plaintiff's state-law medical malpractice claims against Defendant City of New York should be dismissed for the same reasons given by the state court in its November 2012 order dismissing Plaintiff's case.  (*See id.* ¶¶ 33–34.)

    1.  Timeliness of Motion

As an initial matter, Plaintiff argues that Defendants' Motion should be denied because Defendants waited one year after "inherit[ing]" the case before filing the Motion, which Plaintiff characterizes as a "lengthy delay."  (*See* Opp'n 3.)  The Court disagrees.

Under Federal Rule of Civil Procedure 12(c), a party may file a motion to dismiss on the pleadings at any time after the pleadings are closed so long as the motion is filed "early enough not to delay trial." As noted above, Plaintiff filed his Second Amended Complaint on July 19, 2013. (*See* SAC). Defendants then filed their Motion approximately seven months later, on February 21, 2014. (*See* Defs.' Mem.) Discovery was still ongoing at that time, but expert discovery had not yet occurred, and a trial date had not yet been set, (*see* Reply ¶¶ 23–24), so the Court's consideration of Defendant's Motion will have no perceptible effect on any yet-to-be-scheduled trial, *see Liang v. City of New York*, No. 10-CV-3089, 2014 WL 4966074, at *3 (E.D.N.Y. Oct. 3, 2014) (finding that a Rule 12(c) motion was timely even though it was filed after discovery was complete, and while the parties were briefing a motion for summary judgment, because it would "not cause any delay in [the] litigation"); *Bey v. City of New York*, No. 99-CV-3873, 2010 WL 3910231, at *3 (S.D.N.Y. Sept. 21, 2010) (finding that a Rule 12(c) motion was timely because a trial date had not yet been set, the parties had not agreed on a joint pre-trial order, and "reaching the merits of [the] [d]efendant's Rule 12(c) motion [would] serve[] the interest of judicial economy"); *Runge v. Erie Ins. Grp.*, No. 09-CV-792A, 2010 WL 5860401, at *4 (W.D.N.Y. May 24, 2010) (holding that a Rule 12(c) motion was "timely . . . since it was filed well before a trial"). In fact, insofar as Defendants' Motion has caused any delay, it is a product of the several extensions Plaintiff has required to file his Opposition. The Court therefore finds that Defendants' Motion is timely.

### 2. Deliberate Indifference

"While prison officials should provide adequate medical care to prisoners, 'not every lapse in medical care is a constitutional wrong.'" *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). In this

context, a post-state-conviction-prisoner's claim that he received unconstitutionally inadequate medical care is analyzed under the Eighth Amendment's prohibition on the infliction of "cruel and unusual punishment," as applied to the states by the Fourteenth Amendment.  *See Mahone v. City of New York*, No. 13-CV-8014, 2014 WL 1407702, at *2 n.3 (S.D.N.Y. Apr. 11, 2014); *see also Caiozzo v. Koreman*, 581 F.3d 63, 69 & n.3 (2d Cir. 2009) (noting that "[a] convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment," and that, "[i]n the case of a state prisoner, it is the Eighth Amendment as applied to the States by the Fourteenth Amendment").[8]  To state such a claim, Plaintiff must plausibly allege that "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities," and "(2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (alteration omitted) (internal quotation marks omitted); *see also Youmans v. City of New York*, 14 F. Supp. 2d 357, 361 (S.D.N.Y. 2014) (same).

Here, though Plaintiff does not discuss them separately, Plaintiff's allegation of deliberate indifference concerns two aspects of the Rikers Defendants' actions.  First, Plaintiff

---

[8] Based on Plaintiff's allegation that he was "awaiting transfer to state prison" when the alleged misconduct occurred, the Court assumes Plaintiff had already been convicted of the crime(s) for which he was ultimately incarcerated at that time.  (SAC ¶ 11.)  However, even if Plaintiff had not yet been convicted, meaning his claim would properly be analyzed under the Due Process Clause of the Fourteenth Amendment, the same Eighth Amendment "cruel and unusual punishment" standard would apply.  *Caiozzo v. Koreman*, 581 F.3d 63, 69, 71 (2d Cir. 2009) (noting that, while the Due Process Clause governs claims of deliberate indifference made by individuals who are "detained prior to conviction," "[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"); *see also Nielsen v. Rabin*, 746 F.3d 58, 63 n.3 (2d Cir. 2014) (citing *Caiozzo* for the same proposition).

alleges that the Rikers Defendants treated Plaintiff as if he were Luis Vega: Phillips-Drakes

provided Plaintiff with the wrong medication, and Dr. Than assessed Plaintiff's symptoms,

without first checking Plaintiff's identification.  Second, Plaintiff alleges that the Rikers

Defendants, when they subsequently learned Plaintiff's true identity, failed to acknowledge and

notify others of their mistake, and instead participated in a cover-up.  Neither set of actions, as

alleged, rises to the level of deliberate indifference.

a.  <u>Medication Error and Subsequent Treatment</u>

Plaintiff first alleges in his Second Amended Complaint that Phillips-Drakes incorrectly

administered Librium, rather than Tylenol with Codeine, to Plaintiff.  (SAC ¶ 16.)  Plaintiff

alleges that before he took the Librium, he "protested that [it] was inconsistent in size, shape[,]

and color to [his] regularly prescribed medication."  (*Id*. ¶ 16.)  Plaintiff further alleges that, after

Phillips-Drakes notified Dr. Than of his symptoms, Dr. Than examined Plaintiff, assuming he

was Luis Vega, and determined that he needed to be rushed to the hospital.  (*Id*. ¶ 18; *see also*

Opp'n 17 (alleging that Dr. Than never checked Plaintiff's identification).)

Here, even assuming that Plaintiff's allegations satisfy the first, objective prong of a

deliberate indifference claim, Plaintiff has failed to allege facts satisfying the second, subjective

prong.  "In medical-treatment cases not arising from emergency situations, the official's state of

mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the

plaintiff proves that the official acted with deliberate indifference to inmate health."  *Nielsen v.*

*Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Salahuddin*,

467 F.3d at 280).  "Deliberate indifference is a mental state equivalent to subjective

recklessness," and it "requires that the charged official act or fail to act while actually aware of a

substantial risk that serious inmate harm will result."  *Id.* (internal quotation marks omitted)

17

(quoting *Salahuddin*, 467 F.3d at 280).  Conversely, "mere negligence is not actionable, nor is mere medical malpractice . . . tantamount to deliberate indifference."  *Bell*, 980 F. Supp. 2d at 561 (internal quotation marks omitted); *see also Salahuddin*, 467 F.3d at 280 (noting that "recklessness entails more than mere negligence"); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("'Deliberate indifference' describes a mental state more blameworthy than negligence . . . ."); *Santana v. City of New York*, No. 13-CV-3034, 2014 WL 1870800, at *5 (S.D.N.Y. May 8, 2014) ("[D]eliberate indifference is more substantial than mere disagreement over a course of treatment, negligence[,] or even medical malpractice.").

Under certain circumstances, it is conceivable that a plaintiff's allegations could demonstrate that a defendant was deliberately indifferent to a substantial risk of harm resulting from the administration of incorrect, and therefore potentially dangerous, medication.  Here, however, Plaintiff's other allegations undercut Plaintiff's claim.  For example, Plaintiff alleges that "prior to administ[ering]" the Librium, Phillips-Drakes "failed to verify [Plaintiff's] identification," (SAC ¶ 16), and that Dr. Than likewise failed to check Plaintiff's identification before treating him, (Opp'n 7).  According to Plaintiff, the Rikers Defendants both "believed [Plaintiff] to be another patient, Luis Vega."  (*Id.* ¶ 20.)  Thus, instead of alleging that Phillips-Drakes administered a random or unknown medication to Plaintiff, Plaintiff alleges that Phillips-Drakes administered "another patient[']s medication."  (*Id.* ¶ 16.)  In this context, Plaintiff's allegation that he "protested" that he had been given the incorrect medication, but that Phillips-Drakes nevertheless administered it to him, does not rise to the level of subjective recklessness, because Plaintiff alleges that the Rikers Defendants both thought that Phillips-Drakes had given Plaintiff the correct medication.  *See Salahuddin*, 467 F.3d at 281 ("The charged official must be subjectively aware that his conduct creates [a substantial] risk [of harm].")  Even if, as Plaintiff

18

suggests, the Rikers Defendants should have known that without checking identification, their conduct posed a great risk to Plaintiff, a "belief that . . . conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Id.*; *see also Jordan v. Fischer*, 773 F. Supp. 2d 255, 275 (N.D.N.Y. 2011) ("The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference.").  At most, therefore, the Rikers Defendants acted negligently.  *See Rodriguez v. Correct Care Solutions, L.L.C.*, No. 11-CV-2285, 2012 WL 811515, at *1, *3 (S.D.N.Y. Mar. 8, 2012) (granting a motion to dismiss where "[a]dministering another inmate's drugs to [the plaintiff] may have been negligent," but the complaint had failed to allege facts "that [the defendant] did so deliberately" in light of the allegation that the defendant "[mistook] [the plaintiff] for another inmate"); *Henry v. Nassau Univ. Med. Ctr.*, No. 06-CV-6867, 2008 WL 638246, at *4 (E.D.N.Y. Mar. 6, 2008) (granting a motion to dismiss where the plaintiff alleged that he received incorrect medication due to a misdiagnosis, but did not allege "that [the] [d]efendants had knowledge that [the] [p]laintiff faced a substantial risk of serious harm or that they disregarded such risk"); *Colon v. Corr. Med. Servs.*, No. 07-CV-189, 2007 WL 2257424, at *2 (D. Del. Aug. 1, 2007) ("[T]he act of giving the wrong medication does not rise to the level of deliberate indifference. . . .  A mistake in administering medication is more appropriately recoverable in negligence rather than a § 1983 action, and allegations of medical malpractice are not sufficient to establish a Constitutional violation."); *Long v. Lafko*, 254 F. Supp. 2d 444, 447 (S.D.N.Y. 2003) (granting a motion to dismiss where the doctor allegedly "fail[ed] to check [a dose of] medication before administering it," and where the plaintiff "plead[ed] no other facts directly implicating [the defendant] in any other conduct that crosse[d] the rigorous deliberate indifference threshold"); *cf. Bell*, 980 F.

Supp. 2d at 562 (granting a motion to dismiss where the plaintiff alleged that prison doctors erroneously delayed administration of prescription medication because the plaintiff "fail[ed] to allege that the delay was either intentional or reckless").[9]

Moreover, Plaintiff's allegations in the Second Amended Complaint demonstrate that, after taking the Librium, Plaintiff received prompt and adequate medical care.  When Plaintiff became symptomatic, he was "*immediately* seen by . . . [Phillips-]Drakes," who took his vital signs and sought to diagnose his symptoms.  (SAC ¶ 17 (emphasis added).)  Shortly thereafter, Dr. Than examined Plaintiff and, after consulting with another doctor, "determined [that Plaintiff] was suffering acute cardiac abnormalities[] and needed to be *immediately rushed* . . . to [a hospital] for *emergency treatment and intervention*."  (*Id.* ¶ 18 (emphasis added).)  An ambulance arrived to transport Plaintiff to the hospital less than an hour later.  (*Id.* ¶ 19; *see also* Opp'n 1 (noting Plaintiff was "immediately rushed via ambulance to [the hospital] for emergency treatment and care).)[10]  Although these allegations perhaps add to the weight of Plaintiff's allegation that he suffered serious harm, they also demonstrate that, far from "never attempt[ing] to administer or even suggest[ing] . . . any prophalytic [sic] remedy or treatment that could alleviate [Plaintiff's] suffering," (Opp'n 6; *see also* SAC ¶ 23 (alleging that the Rikers

---

[9] Notably, even Plaintiff alleges that the Rikers Defendants' conduct was negligent.  (*See* SAC ¶ 21 (alleging that, at a certain point, the Rikers Defendants "were notified of their negligence by" EMT Rosado).)

[10] Plaintiff does allege in the Second Amended Complaint that it took the ambulance up to 52 minutes to arrive, (*see* SAC ¶¶ 18–19 (alleging that the Rikers Defendants made the emergency-treatment determination "at approximately 6:15 P.M." but that the ambulance arrived "at approximately 7:07 P.M.")), which some might characterize as a "delay," even though the Second Amended Complaint does not include such a characterization.  However, Plaintiff does not allege that any injuries resulted from such a delay, nor does he allege that the Rikers Defendants caused a delay in Plaintiff's transfer to the hospital.  (*See id.* ¶ 18 (alleging that Dr. Than determined that Plaintiff "needed to be *immediately rushed*" to the hospital (emphasis added)).)

Defendants "fail[ed] to institute immediate prophalytic [sic] treatment")), the Rikers Defendants

acted quickly after Plaintiff became symptomatic, and therefore they were not reckless, *see*

*Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565, at *2, *7–8

(E.D.N.Y. July 11, 2012) (finding that, where a plaintiff alleged that he had suffered symptoms

from taking incorrect medication but that the prison doctors ultimately ordered that he be

"transported immediately" to a hospital for treatment, the "[a]ccidental[] administ[ration] [of] the

wrong medication in [that] situation [did] not constitute recklessness, and, at worst, reach[ed]

only the level of negligence"); *Rodriguez*, 2012 WL 811515, at *3 (finding no deliberate

indifference where the plaintiff "was seen within hours of ingesting the incorrect drugs and was

seen a total of five days out of the six following the mistake"); *see also Ivey v. City of New York*,

Nos. 12-CV-3580, et al., 2013 WL 6838954, at *3 (S.D.N.Y. Dec. 12, 2013) (granting a motion

to dismiss where it was "[im]plausible that [the] defendants [had] acted with 'deliberate

indifference'" because "they appeared to have taken immediate steps to provide treatment"

"almost immediately" after the plaintiff "was diagnosed with a serious . . . condition"); *Farray v.*

*Green*, No. 12-CV-4717, 2013 WL 5676315, at *4 (E.D.N.Y. Oct. 16, 2013) (granting a motion

to dismiss for failure to show deliberate indifference where the plaintiff alleged that prison

officials ignored his requests for treatment and thereby caused him injury, but that an official

"immediately called for medical attention when he saw that [the plaintiff needed treatment], and

that the plaintiff received medical treatment that same night" (internal quotation marks omitted)).

b.   Failure to Acknowledge and Notify, and Alleged Cover-up

Plaintiff alleges that "when presented with actual knowledge of [Plaintiff's] serious

medical need by EMT D. Rosado, [the Rikers Defendants] failed to acknowledge their error of

medicating [Plaintiff] with another patient[']s medication, participating in a cover-up."  (SAC

¶ 23.)  In his Opposition, Plaintiff takes this allegation a step further and for the first time claims that the Rikers Defendants "were well aware that Plaintiff was suffering from life threatening side effects due to being administered Librium," because they are "trained and licensed medical professionals," implying that the Rikers Defendants were aware of their mistake prior to the arrival of the EMTs.  (Opp'n 4.)  Plaintiff therefore alleges that the Rikers Defendants acted recklessly when they "failed to notify [the hospital] or the [EMTs] who ultimately transported Plaintiff to [the hospital]" that Plaintiff was "suffering from life threatening side effects due to being administered Librium," (*id.* at 4), which "plac[ed] . . . Plaintiff in further Danger," (*id.* at 10).

Where new allegations in a pro se plaintiff's opposition memoranda "are consistent with the allegations contained" in the Complaint, they may be read "as supplements to th[e] pleadings."  *Boyer v. Channel 13, Inc.*, Nos. 04-CV-2137, et al., 2005 WL 2249782, at *6 (S.D.N.Y. Mar. 9, 2005); *see also Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (considering "factual allegations made by pro se [p]laintiff in [the plaintiff's] opposition papers" because they were "consistent with those in the initial complaint and amended complaints" (italics omitted)); *Gertskis v. U.S. E.E.O.C.*, No. 11-CV-5830, 2013 WL 1148924, at *1 (S.D.N.Y. Mar. 20, 2013) (considering allegations from the plaintiff's opposition memoranda "to the extent they are consistent with the [a]mended [c]omplaint"); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012) ("[B]ecause a pro se plaintiff's allegations must be construed liberally[,], it is appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint." (italics omitted)).  In this case, therefore, the

Court will construe any new allegations contained in the Opposition as part of the pleadings, provided they are consistent with the allegations contained in the Second Amended Complaint.

In the Second Amended Complaint, Plaintiff alleges that EMT Rosado notified the Rikers Defendants of their error upon his arrival, (*see* SAC ¶ 21; see also *id.* ¶ 23 (alleging that the Rikers Defendants were deliberately indifferent "when presented with actual knowledge of [Plaintiff's] serious medical need by [EMT] D. Rosado")), and that the Rikers Defendants both "believed" that Plaintiff was Vega prior to that time, (*id.* ¶ 20).  However, in his Opposition, Plaintiff now claims that the Rikers Defendants failed to notify the hospital and EMTs of their mistake.  (Opp'n 4, 10.)  These new allegations are inconsistent with Plaintiff's clear suggestion in the Second Amended Complaint that the Rikers Defendants were unaware of their mistake until the EMTs arrived.  The Court, therefore, declines to treat Plaintiff's new allegations as part of the pleadings.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) ("[O]ur cases have also indicated that we cannot read into pro se submissions claims that are not 'consistent' with the pro se litigant's allegations . . . ." (italics omitted)); *Blue v. Macy's Herald Square*, No. 12-CV-5673, 2013 WL 3717777, at *1 n.3 (S.D.N.Y. July 16, 2013) (declining to consider an allegation from the plaintiff's opposition because it was inconsistent with the complaint).

Even if the Court were to credit Plaintiff's new allegations, however, the allegations as a whole are still insufficient to constitute a claim for deliberate indifference.  Taking a liberal view of Plaintiff's allegations regarding the Rikers Defendants' failure to acknowledge their mistake, failure to notify the hospital and EMTs of that mistake, and attempted cover-up, the Court may construe them in one of two ways.  Either (a) they form part of the same instance of deliberate

indifference that began when Phillips-Drakes gave Librium to Plaintiff, or (b) they are a separate and distinct instance of deliberate indifference.  Either way, Plaintiff fails to state a claim.

First, treating Plaintiff's allegations as if they refer to part of a single deliberately indifferent course of conduct, Plaintiff claims that they show that the Rikers Defendants acted with a "sufficiently culpable state of mind."  (Opp'n 3–4.)  The Court disagrees.  Plaintiff does not allege that the Rikers Defendants believed that a failure to acknowledge their mistake, or notify the hospital or EMTs of the mistake prior to their arrival, posed a substantial risk of harm to Plaintiff.  *See Salahuddin*, 467 F.3d at 281 ("The charged official must be subjectively aware that his conduct creates [a substantial] risk [of harm]."); *Henry*, 2008 WL 638246 at *1, *4 (granting a motion to dismiss where the plaintiff alleged that he received incorrect medication due to a misdiagnosis, but did not allege "that [the] [d]efendants had knowledge that [the] [p]laintiff faced a substantial risk of serious harm or that they disregarded such risk").  Instead, the Rikers Defendants' conduct, as alleged, suggests that rather than acting with the "wantonness in light of the particular circumstances surrounding the challenged conduct" required for a finding of deliberate indifference, *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (internal quotation marks omitted), the Rikers Defendants took "reasonable measures" to address Plaintiff's symptoms, *see Salahuddin*, 467 F.3d at 279 ("As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." (citing *Farmer v. Brennan*, 511 U.S. 825, 844–47 1994)); *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 615, 620 (2d Cir. 1996) ("[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." (citing *Farmer* 511 U.S. at 846–47)), namely by diagnosing Plaintiff and promptly arranging for him to be sent to the hospital, (*see* SAC ¶¶ 17–18).  *See also Ivey*, 2013

24

WL 6838954, at *3 (granting a motion to dismiss where it was "[im]plausible that [the] defendants [had] acted with 'deliberate indifference'" because "they appeared to have taken immediate steps to provide treatment" "almost immediately" after plaintiff "was diagnosed with a serious . . . condition"); *Farray*, 2013 WL 5676315, at *4 (granting a motion to dismiss where the plaintiff alleged that a prison official "immediately called for medical attention when he saw that [plaintiff needed treatment], and that plaintiff received medical treatment that same night" (internal quotation marks omitted)).  The Rikers Defendants were therefore, at most, only negligent in their failure to acknowledge and report their mistake.  *Cf. Miller*, 2012 WL 2847565, at *2, *7 (finding that, where a plaintiff alleged that he had suffered symptoms from taking incorrect medication but that the prison doctors ultimately ordered that he be "transported immediately" to a hospital for treatment, the "[a]ccidental[] administ[ration] [of] the wrong medication in [that] situation [did] not constitute recklessness, and, at worst, reach[ed] only the level of negligence"); *Martinez v. Lape*, No. 09-CV-0665, 2011 WL 4527943, at *8 (N.D.N.Y. Mar. 28, 2011), *adopted by* 2012 WL 4528980 (N.D.N.Y. Sept. 28, 2011) (finding that the failure of medical staff to properly notify the dietician and kitchen staff of dietary needs, carrying risk of "pain and suffering," "amounts to negligence at most and is insufficient to establish the subjective element of deliberate indifference").

For similar reasons, Plaintiff's argument in his Opposition that the alleged cover-up shows that the Rikers Defendants "acted with a state of mind equivalent to criminal recklessness" is also without merit.  (Opp'n 3; *see also id.* at 9 (alleging that the Rikers Defendants "crossed the line from simple malpractice to deliberate indifference by participating in th[e] cover[-]up").)  Plaintiff does not explicitly allege that the cover-up occurred while Plaintiff was in the Rikers Defendants' medical care.  In fact, Plaintiff's allegations suggest that

there could not have been a cover-up until the ambulance arrived and EMT Rosado informed the
Rikers Defendants of their mistake, meaning the cover-up could not have affected the medical
care Plaintiff received from them, let alone undo the negligent provision of Librium.  (*See* Reply
¶ 9; *see also* SAC ¶ 21 (noting that "after [D]efendants . . . were notified of their negligence by
[EMT] Rosado, [they] . . . participate[d] in a cover-up").)  However, even if the Court assumes
that the cover-up began immediately after Plaintiff took Librium, Plaintiff fails to explain how
the cover-up indicates that the Rikers Defendants were reckless.  It does not show that the Rikers
Defendants knew of and disregarded a substantial risk of harm when administering Librium to
Plaintiff, or when subsequently treating him, particularly given the Rikers Defendants (a)
"believed" Plaintiff was Vega at that time, and (b) provided, and arranged for, prompt medical
care.  (*See id.* ¶¶ 17–18, 20.)  Indeed, rather than indicating that the Rikers Defendants were
reckless, the cover-up may have been an attempt to rebuff a potential malpractice claim.  (*See id.*
¶ 21 (alleging that the Rikers Defendants "participate[d] in a cover-up in order to protect
themselves from possible legal, professional, and/or other ramifications").)  Therefore, while a
cover-up, if it happened, might well be, to use Plaintiff's word, "reprehensible," (Opp'n 4), it
does not plausibly suggest that the Rikers Defendants were reckless at the critical time, *cf.*
*McPherson v. Rogers*, No. 12-CV-0766, 2014 WL 675830, at *13 (N.D.N.Y. Feb. 21, 2014)
(finding, in considering a motion for summary judgment, that even if the plaintiff's testimony
that a cover-up occurred was fully credited, "no reasonable factfinder could conclude that [the]
defendant . . . act[ed] or fail[ed] to act while actually aware of a substantial risk that serious . . .
harm [would] result" (first alteration added) (internal quotation marks omitted)).

      Second, treating Plaintiff's allegations as if they refer to a separate act of deliberate
indifference, Plaintiff fails to allege sufficient facts to meet the first, objective prong of a

deliberate indifference claim. "To determine whether a deprivation is[] 'objectively, sufficiently serious,' a court first asks 'whether the person was *actually* deprived of adequate medical care.'" *Rodriguez*, 2012 WL 811515, at *2 (quoting *Salahuddin*, 467 F.3d at 279 (emphasis added)). Here, Plaintiff does not satisfactorily connect the Rikers Defendants' failure to acknowledge or notify others of their mistake after it was made, or the alleged subsequent cover-up, to any inadequacy in his medical care.

By Plaintiff's own admission, EMT Rosado discovered upon his arrival that Phillips-Drakes had given Plaintiff the wrong medication, and Plaintiff left the Rikers Defendants' care at that time. (*See* SAC ¶ 20.) Therefore, by approximately 7:07 pm on the evening of the events at issue, (*see* id. ¶¶ 19–20), approximately an hour after Phillips-Drakes administered the wrong medication, (see *id.* ¶ 16), the medical professionals in charge of Plaintiff's medical care had all the available relevant information about Plaintiff's condition. The fact that it was the Rikers Defendants who committed the initial mistake, and not other medical professionals at Rikers, would not have had any impact on Plaintiff's treatment, and even if it did, EMT Rosado had that information.

It is therefore unclear what impact the Rikers Defendants' acknowledgement of their mistake, or notification of the EMTs and the hospital of that mistake, would have had on Plaintiff's treatment.[11] While Plaintiff alleges that the Rikers Defendants' actions resulted in a "failure to institute immediate prophalytic [sic] treatment," (*id.* ¶ 23), or at least "significantly

---

[11] Plaintiff alleges in the Second Amended Complaint that Dr. Than examined him fifteen minutes after he took Librium and determined he "needed to be immediately rushed via emergency medical services to [the hospital]," meaning the EMTs were on their way to Rikers within minutes of Plaintiff becoming symptomatic. (SAC ¶ 18.) Plaintiff does not allege, nor does common sense suggest, that the EMTs would have arrived any sooner had the Rikers Defendants admitted their mistake.

delay[ed] treatment," (*id.*), and "plac[ed] . . . Plaintiff in further danger," (Opp'n 10), Plaintiff

does not explain how this occurred in light of his other allegations about the prompt treatment

the Rikers Defendants provided.  In fact, Dr. Than's determination, merely 15 minutes after

Plaintiff took Librium, that Plaintiff needed to be "immediately" sent to the hospital suggests that

the Rikers Defendants could do nothing further for Plaintiff at Rikers.  (*See* SAC ¶¶ 17–18.)

Plaintiff's allegation regarding the impact of the Rikers Defendants' actions on his treatment is

therefore merely conclusory and is not sufficient to survive Defendants' Motion.  *See Twombly*,

550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the

speculative level."); *Achtman v. Kirby, McIlerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir.

2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will

not suffice to defeat a motion to dismiss"); *Banks v. Mental Health Clinicians*, No. 11-CV-7848,

2012 WL 6201259, at *5 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss where the

plaintiff alleged that the defendants were deliberately indifferent when they exacerbated the

plaintiff's suicide risk by transferring him to a special unit for mentally ill inmates, finding, inter

alia, that Plaintiff did not state facts that supported his bald allegation that Plaintiffs acted with

"punitive intentions") (internal quotation marks omitted).  Taken together, therefore, Plaintiff's

allegations are insufficient to meet the elements of a deliberate-indifference claim, and the Court

grants Defendants' Motion with respect to this claim and with respect to all Defendants.

Accordingly, the Court need not consider Defendants' argument that the Complaint fails to state

a claim against Defendant City of New York (the "City").  (*See* Defs.' Mem. ¶¶ 28–31.)

     3.  *Monell* Claim

     Even if the Court found that Plaintiff stated a plausible deliberate indifference claim

against the Rikers Defendants, it nonetheless agrees with Defendants that Plaintiff has failed to

sufficiently allege a § 1983 claim against the City under *Monell v. Department of Social Services.*, 436 U.S. 658 (1978).  It is well-settled that a municipality may not be held liable under § 1983 "by application of the doctrine of *respondeat superior.*"  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (citing *Monell*, 436 U.S. at 691); *see also Vassallo v. Lando,* 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris,* 489 U.S. 378, 385 (1989); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of the [p]laintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." (citing *Monell*, 436 U.S. at 690–91).)  In other words, "to establish municipal liability under § 1983, a plaintiff must prove that action pursuant to official municipal policy caused the alleged constitutional injury."  *Cash v. Cnty. of Eerie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted).  "A municipal policy may be pronounced or tacit and reflected in either action or inaction," *id.* at 334, but either way Plaintiff must allege it with factual specificity, rather than by bare and conclusory statements, *Perez v. Cnty. of Westchester*, 83 F. Supp. 2d 435, 438 (S.D.N.Y. 2000) ("The complaint does not even generally indicate the nature of the policy or custom being alleged, such as a failure to train county officers.").

Plaintiff has failed to allege that the Rikers Defendants committed misconduct pursuant to official municipal policy.  In his Second Amended Complaint, Plaintiff alleges that the City had "notice and knowledge" of Defendants' actions, and that it "encouraged and permitted" them.  (SAC ¶ 30.)  Plaintiff further alleges in his Opposition that the "'identified custom'" for *Monell* purposes is "the grossly deficient medical care that the City of New York utilizes for its

Rikers Island Prison Facility," (Opp'n 11), and seemingly also is the City's "failure to train and supervise its employees," (*Id.* at 12.)  Of these allegations, the only factually specific allegation regarding a policy or custom is that the City failed to train its employees.  However, because Plaintiff provides no additional detail beyond the general assertion that the City failed to train its employees, his allegation is insufficient to state a claim.  *See Doe v. City of New York*, No. 09-CV-9895, 2012 WL 2900483, at *2 (S.D.N.Y. July 2, 2012) (finding that the plaintiff did not "adequately allege[ ] that a failure to train or supervise caused [the plaintiff's] injury," because the complaint "contain[ed] no facts elaborating on . . . the defective nature of the . . . training program, let alone . . . how a defect in training . . . caused her harm."); *Johnson v. City of New York*, No. 12-CV-2484, 2012 WL 2394894, at *1 (E.D.N.Y. June 25, 2012) ("Neither the mere recitation of a failure to train municipal employees[,] nor [reference to] a single incident . . . , is sufficient to raise an inference o[f] the existence of a custom, policy, or practice.").

Additionally, Plaintiff notes in his Opposition that he has "multiple pending discovery demands" relevant to his *Monell* claim.  (Opp'n 11.)  Plaintiff admits that because discovery has not yet been completed, he has "not yet had a chance to fully formulate his claim against the [C]ity." (*Id.* at 12.)  The fact that Plaintiff needs discovery to adequately state a claim for *Monell* is tantamount to an admission that he has, thus far, failed to state a *Monell* claim.  The Court therefore grants Defendants' Motion with respect to Plaintiff's claim against the City.

Plaintiff's state-law claims arise only under a theory of supplemental jurisdiction, and therefore the Court need not and will not exercise its discretion to maintain such jurisdiction over those claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Matican v. City of New York*, 524 F.3d 151,

154–55 (2d Cir. 2008) ("[I]f [a plaintiff] has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims.").

### III.  CONCLUSION

In light of the foregoing, the Court dismisses Plaintiff's Second Amended Complaint. However, this dismissal is without prejudice, and Plaintiff is given 30 days to submit a Third Amended Complaint.  The Clerk of Court is respectfully requested to terminate the pending Motion.  (*See* Dkt. No. 83.)

SO ORDERED.

Dated:          December 2  , 2014
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

31